**People of the State of Illinois, Plaintiff-Appellee, v. Walter Danner, Defendant-Appellant.**

**Gen. No. 53,039.**

First District, Third Division.

January 16, 1969.

Walter La Von Pride, of Chicago, for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Edward Stasukaitis, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE SCHWARTZ delivered the opinion of the court.

Defendant was found guilty by a jury of the crimes of murder and attempt to commit robbery. He was sentenced to a term of 50 to 100 years on the murder charge and 7 to 14 years on the attempt charge, the sentences to be served concurrently. On appeal he contends that he was not proved guilty beyond a reasonable doubt, that the sentence of 50 to 100 years was excessive and that his legal representation was inadequate. He presented no evidence. The facts follow.

Fred Gardaphe, the deceased, owned and operated a pawnshop at 6 North Broadway in Melrose Park, Illinois, and lived in an apartment above the shop. His

12-year-old grandson Michael Gardaphe testified that on December 16, 1966, he had dinner with his grandparents in their apartment and that after dinner his grandfather went downstairs to the shop. About five minutes later Michael went downstairs and found his grandfather in the front part of the store talking to one Albert Schwab and his son. His grandfather went into a small room at the rear of the store to answer the telephone. That room which was not open to customers was separated from the rest of the store by a Dutch door and contained a safe, a cash register and merchandise which was being stored. Just then the defendant and another man ran into the store. Defendant ran into the back room while his partner held a gun on those in the front of the shop. Michael heard a noise, saw his grandfather fall to the floor and then heard both loud and soft shots. Defendant called out to his partner that he had been shot and his partner ran from the store. Michael looked over the lower half of the Dutch door and saw his grandfather struggling with the defendant. His grandfather was face down on the floor and the defendant was kneeling on top of him. Schwab and his son ran out of the store and Michael followed them. They ran to a store next door and told an employee there, J. A. Edgemon, to call the police and an ambulance. Michael and Edgemon then went back to the pawnshop. Edgemon entered the store, but defendant pointed a gun at him and told him to get out. Defendant crawled over the lower half of the door, fell to the floor, pointed the gun at Michael and *crawled* from the store, holding and pointing his gun.

Albert Schwab testified that he and his son were in the pawnshop with the victim and his grandson, that two men entered the store, that one went to the back room while the other held a gun on him and shortly thereafter he heard a noise in the back of the room and the

man who had been holding the gun on him ran out through the front door.

J. A. Edgemon testified that he worked in a store near the victim's pawnshop, that on the night in question Michael Gardaphe ran into the store and told him his grandfather was being hurt. Edgemon told his employer to call the police while he ran to the pawnshop. As he entered the shop the defendant pointed a gun at him and told him to get out. A few minutes later the defendant came out, fell on all fours and crawled away toward a set of railroad tracks.

Police Officer Fred Jackson testified that he went to the victim's pawnshop in response to a radio call and was directed to a set of railroad tracks. Upon a search of the tracks he found the defendant lying face down about 200 feet from the pawnshop. He recovered a .38 caliber revolver which was protruding from defendant's rear pocket. Police Officer Robert Kuhlmann testified he found a .25 caliber revolver in a pool of blood after the victim was removed from the scene.

Dr. John Belmonte, the Coroner's physician, testified that his examination of the victim revealed a bullet wound on the right side of the neck, a bullet wound in the left thigh and multiple bruises, abrasions and lacerations. The bullet which struck the victim's neck traveled upward and back and was removed from the left temple. It was a .25 caliber bullet and in the doctor's opinion caused death. A .38 caliber bullet was removed from his thigh.

Defendant's first contention is that he was not proven guilty beyond a reasonable doubt. He bases his contention on the fact that the gun found in his pocket was a .38 caliber revolver whereas the slug taken from the wound which caused the victim's death was from a .25 caliber weapon. He also argues that the evidence fails to prove he was attempting to rob the pawnshop at the

time so that he could not have been guilty of a felony murder.

■■ If the evidence establishes that defendant was attempting to commit a forcible felony and the victim's death was a result of that attempt, it is immaterial who fired the particular shot which killed the victim or whether the killing was intentional or accidental. People v. Grant, 313 Ill 69, 144 NE 813; People v. Connolly, 33 Ill2d 128, 210 NE2d 523; Ill Rev Stats, c 38, § 9–1(a) (3) (1967), see Committee Comments. Here the uncontradicted evidence established that defendant and an accomplice entered the pawnshop; that while his accomplice held three witnesses captive with a gun, the defendant entered the rear of the shop where a safe, a cash register and merchandise were kept; that a struggle ensued between the victim and defendant; that several shots were fired which resulted in the victim's death; that the accomplice fled when defendant called out he had been shot and that defendant himself attempted to escape and in the process threatened two persons with a gun. The only reasonable inference that can be drawn from these facts is that defendant and his partner entered the pawnshop for the purpose of committing the forcible felony of robbery and as a direct result of the attempted robbery, Fred Gardaphe was fatally shot while struggling with the defendant.

■ Defendant's second contention is that the sentence of 50 to 100 years was excessive. He declined to testify in his own behalf at the hearing on mitigation and the only point on which mitigation might be indicated is that no prior criminal record was revealed. The State pointed out the brutal nature of the crime and the danger of repetition. In sentencing the defendant the court considered the seriousness of the offense and the prospect of defendant's rehabilitation, which the Parole Board may consider in less than 20 years. Ill Rev Stats, c 38, § 123–2(a)(3) (1967). The Illinois

130

Supreme Court in affirming a 50 to 100 year sentence held that "the trial judge has a superior opportunity in the course of the trial and the hearing in aggravation and mitigation to make a sound determination concerning the punishment to be imposed than do the appellate tribunals." People v. Caldwell, 39 Ill2d 346, 236 NE2d 706. Defendant in the instant case committed a brutal murder in the course of which he himself was seriously wounded and while crawling away from the scene he threatened with a revolver a 12-year-old boy and another man. In so doing defendant exhibited the characteristics of a desperate and dangerous criminal. The penalty imposed was not disproportionate to the crime committed.

█ Defendant's third contention is that the judgment should be reversed because his attorney failed to file more than one jury instruction. He argues this indicates his attorney was incompetent and that he was thereby prejudiced. He cites no authority for that contention nor does he show how he was in any way prejudiced by failure of his counsel to file more instructions. In a desperate case such as this one, defendant's trial counsel could have decided his only hope was that the sympathy of the jury might be aroused by the picture of a lone defendant against the world. We find no reversible error in the trial of this case.

Judgment affirmed.

SULLIVAN, P. J. and DEMPSEY, J., concur.