THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES CARTER, Defendant-Appellant.

(Nos. 54117, 54511 cons.; )

First District—April 8, 1971.

Gerald W. Getty, Public Defender, of Chicago, (Lee T. Hettinger and James J. Doherty, Assistant Public Defenders, of counsel,) for apellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Anthony Montemurro, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

Defendant and co-defendant, Ernest Ramey, were charged with armed robbery, attempted rape and aggravated battery. After a joint jury trial both were convicted of each offense. Judgment was entered and they were sentenced to concurrent terms of twenty to forty years for armed robbery, five to ten year for attempted rape and eight to ten years for aggravated battery.

Ramey's conviction was affirmed in *People v. Ramey*, 115 Ill.App.2d 431.* On appeal defendant contends (1) that the trial court erroneously denied his motion to suppress illegally seized evidence; (2) that his pre-trial identification was so unnecessarily suggestive as to deny him due process of law; and (3) that he was not proved guilty beyond a reasonable doubt.

The trial testimony may be summarized. On March 11, 1967, a man in a policeman's uniform came to the door of 2229 West Campbell Park in Chicago. Mrs. Florence Malone (hereinafter "Florence") and her daughter Rita were home. Mrs. Marie DeVito, another daughter, was also with them. When Rita answered the door the man inquired about a hit and run accident. After receiving answers the man drove away in an old car which was white on top and dark on the bottom. (This man was identified as Ernest Ramey on March 19, 1967, by Florence and Rita.)

On March 14, 1967, at approximately 8:00 P.M., Ramey, again dressed in a policeman's uniform, came to the Malone home. He inquired about the For Sale sign in front of the home. Florence showed Ramey the first floor and Rita showed him the second floor. As Rita was showing Ramey some of the rooms the doorbell rang again. Ramey said that it was his brother who was also interested in the home. The second man was let in and Rita showed him the second floor. A short time later Ramey drew a gun and announced a stick-up. At first the women said that they had no money, but then Rita said she had some upstairs. The second man accompanied her upstairs where she gave him some money. Rita identified this man as the defendant. Defendant tried to push Rita towards a bed but she broke away and ran to the stairs. Defendant kicked her in the back and she fell down the stairs. She was then kicked and beaten over the head. Defendant then tore off some of her clothes and attempted to rape her. Rita was tied, gagged and dragged across the room. In the meantime Ramey had knocked Florence un-

---

* James Carter will be referred to as the defendant. Ernest Ramey, who was a co-defendant, will be referred to as Ramey.

conscious. The house was ransacked. The two men left, taking some money, pieces of costume jewelry, a Zenith 25-inch color television set and a Grundig-Majestic stereo record player.

Florence managed to call for help after the men left. The police came and the two women were taken to Mother Cabrini Hospital where they remained for three and one-half weeks. As a result of the occurrence Rita sustained a broken arm in six places, a fractured nose in three places, and contusions and bruises which required twenty-six stitches. Florence received fractured ribs, stitches in the head, and she was black and blue.

The day after the occurrence the women were interviewed by the police. Rita and Florence gave them descriptions of the assailants and later identified Ramey from a photograph. He was arrested and the police learned the name and address of defendant from Ramey, Ramey's brother Irving, and Ramey's mother. The police went to defendant's home and were admitted to the premises. In the front room the officers observed a Zenith color television set and a Grundig-Majestic stereo which they seized. Defendant was not at home. Defendant's sister Gloria accompanied the police and she pointed out the defendant as he was walking down the street with his fiancee, and he was arrested.

Later in the afternoon of March 19 the police took Ramey and defendant to Mother Cabrini Hospital. One of the police officers went into the Malones' room alone for a few minutes and then Ramey and defendant were brought into the room at the same time. Rita and Florence identified them as the assailants, and Rita testified, "There is no doubt in my mind. Never was."

Defendant testified in his own behalf. He stated that he had nothing to do with the robbery. He said that Ramey and two other men asked him on Thursday prior to his arrest if he wanted to buy a color television and a stereo for $800. He was working at Gateway Erectors as a welder earning $2.33 an hour and he was planning to get married in May and had saved some money. He told Ramey that he would buy the television and stereo but that all he had was $300 at the time.

Defendant's finance, Victoria Rodgers, testified that she was with defendant the evening Ramey came over to the house. At defendant's request she gave him the $350 they had and later that evening he showed her the television and stereo he had purchased from Ramey. Mrs. Catherine Carter, Defendant's mother, testified that her son told her that he was buying the set with the money he was saving up for the wedding. She knew he had $400 to get married on.

Ramey testified that defendant had been an associate of his "for a year and half or so."

The jury returned verdicts of guilty as to Ramey and defendant on all charges.

*Opinion*

Defendant contends that the trial court erroneously denied his motion to suppress illegally seized evidence. The testimony presented at the hearing on the motion may be summarized. On March 19, 1967, at approximately 11:30 A.M., the police arrested Ernest Ramey as one of the Malones' assailants. Ramey's brother Irving accompanied the police to the station house. The police described a car allegedly used by Ramey on March 11 and March 14 and Irving stated that the car was similar to one he had seen before. The police then showed Irving a photograph found on Ramey which Irving identified as a friend of Ramey. Irving had seen this person pick up Ramey in the car described by the police. Irving called his mother and she said the man in the photograph was James Carter. Two officers testified that Ramey's mother pointed out defendant's home to them. Irene Ramey denied that she ever helped the police.

At approximately 12:00 noon the police knocked at the door of defendant's home. A female answered; the police identified themselves and asked if defendant was home; she opened the door and replied, "No"; she walked to the dining room and the police followed; and the police again stated that they were looking for defendant. One of the police officers testified that Mrs. Carter answered the door and that they were invited in. However, Gloria Carter, defendant's sister, testified that she answered the door and that the police pushed past her into the apartment.

Once inside the apartment the police observed a Zenith 25-inch color television and Grundig-Majestic stereo set in open view in the living room. These items were seized by the police. Defendant was not at home. The police officers testified that they did not ransack the apartment. The police did not have a warrant for defendant's arrest nor a warrant to search the apartment.

Gloria and Mrs. Carter told the police that the defendant was with his fiancee at her home. Mrs. Carter sent Gloria with the police to point out defendant's fiancee's address. Gloria pointed out defendant as he was walking down the street with his fiancee a short distance from his home. At 12:15 P.M. defendant was arrested.

Defendant argues that the police did not have probable cause to enter his home and seize the television set and stereo record player. He claims that the police violated his Fourth and Fourteenth Amendment rights when they seized these articles. In *People v. Barbee,* 35 Ill. 2d 407, defendant contended that the trial court erroneously overruled

his motion to suppress evidence concerning a stolen automobile which was seized from his garage without a valid search warrant. At the hearing on defendant's motion to suppress the State conceded that the warrant that had been secured was defective. However, the trial court nevertheless found that the conduct of the officers was reasonable and did not violate defendant's constitutional rights. On appeal the Supreme Court agreed with the trial court's conclusion. The court stated at page 411:

"A police officer may arrest without a warrant 'when a criminal offense has in fact been committed, and he has reasonable grounds to believe that the person to be arrested has committed it.' (Ill. Rev. Stat. 1961, chap. 38, par. 657; cf. Ill. Rev. Stat. 1965, chap. 38, par. 107—2.) And when an officer is authorized to make an arrest, he is also authorized 'to break open a door or window of any building in which the person to be arrested is or is reasonably believed to be, if he is refused admittance after he has announced his authority and purpose.' (Code of Crim. Proc., Am. Law Inst. Official Draft (1930) sec. 28; see Ill. Rev. Stat. 1965, chap. 38, par. 107—5 (d), which became effective Jan. 1, 1964.) It is of course true that in the present case the officers who entered Barbee's home made no arrest. But this circumstance can not be significant. Just as 'a search is not to be made legal by what it turns up,' (*United States v. Di Re*, 332 U.S. 581, 595, 92 L.Ed. 210,) so the legality of the conduct of the officers in this case is to be determined upon an appraisal of the situation that confronted them, and not upon the success or lack of success of their efforts.

\* \* \*

The situation was a most sensitive one, for the defendant's home was involved, \* \* \*. The officers reasonably believed that they were in close pursuit of an armed man who had committed a violent offense of a particularly flagrant type. The 'practical demands of effective criminal investigation and law enforcement,' (*Elkins v. United States*, 364 U.S. 206, 222, 4 L.Ed.2d 1669,) required that the defendant be apprehended, regardless of the risks involved in arresting him."

In *People v. Sprovieri*, 43 Ill.2d 223, defendant also argued that certain evidence he sought to suppress was the product of an unlawful search and seizure. The trial court found that the police had reasonable cause to believe that a crime had been committed and that defendant had committed it. However, the trial court held that because the search of defendant's private garage was not reasonably contemporaneous with a valid arrest, the evidence should be suppressed.

The Supreme Court in affirming the Appellate Court's reversal of the finding (*People v. Sprovieri*, 95 Ill.App.2d 10), reiterated its position that the fact that no arrest was made at the time of the search is not significant and that the conduct of the officers "is to be determined upon an appraisal of the situation that confronted them." *People v. Herbert*, 131 Ill.App.2d 518.

▐▌ In the instant case, within approximately thirty minutes after the police learned the identity of Ramey's companion on the evening of the offense, they had reason to believe that they were on the trail of Ramey's accomplice and unless prompt action was taken, defendant would be warned by his accomplice's relatives or friends and flee. The trial court properly held that the police had probable cause for the pursuit, seizure and subsequent arrest of defendant based upon the information, description, photograph and identification of him. Once probable cause was established and the police entered the home of defendant, they were not obliged to overlook the television set nor the stereo which they believed were connected with the crimes against the Malones and which they observed in open view. See *Sprovieri, supra,* and *Barbee, supra*.

Defendant claims that when the police knocked on his door they had no idea whether or not he was at home. However, as the Appellate Court in *Sprovieri, supra*, 14, stated:

"Defendant argues that the police did not reasonably believe that he was actually home at the time they entered. Although the police were told he wasn't at home, they were not required to rely on these statments. Just as in Barbee, where the defendant's wife told the police he was not home, rudimentary police procedure dictates that a suspect's residence be eliminated as a possible hiding place before a search is conducted elsewhere."

We find that the trial court properly denied defendant's motion to suppress the seized evidence.

Defendant next contends that his pretrial identification was so unnecessarily suggestive as to deny him due process of law. (Citing *People v. Lee*, 44 Ill.2d 161, and *People v. Blumenshine*, 42 Ill.2d 508.) After his arrest on March 19, 1967, defendant and Ramey were taken to the hospital by the police for identification by the Malones. Ramey had put on the police uniform found in his room at the time of his arrest, and defendant was wearing a hat, jacket, shirt and pants. Defendant and Ramey were brought into the Malones' room at the same time only after a police officer went in alone, and both were identified as the assailants.

In *People v. Busch and Carter*, 131 Ill.App.2d 430, the defendants also

argued that their pretrial identification was prejudicial and highly suggestive. However, the court found that:

"* * * [D]efendants did not move against nor object to Murphy's in-court identification testimony, evidence they now say deprived them of constitutional rights * * *. Therefore, we hold that defendants failure to move suppression of or make objection to Murphy's testimony was a waiver. A constitutional right, like any other right, may be waived. *People v. Orr*, 10 Ill.2d 95, 100, 139 N.E.2d 212; *Hayes v. State*, 46 Wis.2d 93, 175 N.W.2d 625 (1970); *People v. Schram*, 23 Mich.App. 91, 178 N.W.2d 93 (1970); and compare *People v. Smith*, 44 Ill.2d 82, 87, 254 N.E.2d 492. Judgment is affirmed."

██ In the instant case defendant made no objection to the identification testimony nor did he move to suppress it. Therefore, there was a waiver of his right to object for the first time on appeal.

Defendant also contends that he was not proved guilty beyond a reasonable doubt. He first claims that his identification was doubtful, vague and uncertain. In support of this claim defendant cites *People v. Kincy*, 72 Ill.App.2d 419. In *Kincy* the victim's identification of the defendant was based solely upon the jacket the assailant was wearing. There was no facial identification testimony. In reversing the defendant's conviction the court stated at page 427:

"In the instant case the jacket upon which identification is based was not introduced in evidence. The uncontradicted evidence of the alibi does not tax credulity. Because of the disparity in the amount of money taken and the amount of money found in the defendant's possession, the failure of the State to produce a witness who allegedly followed the perpetrator of the crime for some fifteen or sixteen blocks, and the failure to produce any identification testimony of any witness who testified he or she had seen the face of the perpetrator of the crime, we conclude that there was not such positive identification which fairly or reasonably supports the conviction."

██ In weighing the evidence of identification, the surrounding circumstances, together with the probability or improbability of an adequate opportunity for definite observation must be considered. (*People v. Campbell*, 113 Ill.App.2d 242, and *People v. Marshall*, 74 Ill.App.2d 472.) In the instant case defendant was positively identified by the Malones as one of the men who entered their home on March 14. Rita described defendant as age twenty-four to twenty-six, about six feet tall, slightly built, 155 to 170 pounds, dark complected, and that he wore a three-quarter length jacket and a small fedora hat. Further, Rita answered the door when the defendant came in and she showed him

around the upstairs rooms as he inspected the house. Rita was also with defendant when she gave him her money and when he attempted to push her towards the bed. There was sufficient opportunity for her to see defendant's face during the hour or hour and a half defendant was in the house. We would also point out that the Zenith television set and Grundig-Majestic stereo taken from the Malones were found at defendant's home. Therefore, the instant case is distinguishable from *Kincy, supra*.

■■ The adequacy of defendant's identification raises a question of the credibility of the witnesses which is a matter for the jury to decide, sitting as triers of fact with superior opportunity not only to hear the testimony of the witnesses but to observe their demeanor while on the witness stand. (*People v. Jackson*, 28 Ill.2d 566; *People v. Howard*, 121 Ill.App.2d 87; and *People v. Nelson*, 127 Ill.App.2d 238.) We find that the identification of defendant was clear, convincing and certain.

■■ Defendant next argues that his reasonable account of the manner in which he obtained the television and stereo shows that he was not proved guilty beyond a reasonable doubt. The evidence does not support this claim. The defendant testified that he and his fiancee had saved about $400 for their marriage; the fiancee stated she had $350 which she gave defendant; the mother of defendant said that they had saved about $400 for the impending wedding. It was not unreasonable for the jury to disbelieve that defendant bought a television set and stereo for $800 and made a down payment of almost all the cash he and his fiancee had saved for their wedding.

■■ Defendant also claims that the testimony of the State's witnesses was conflicting and contradictory. The credibility of the witnesses and the weight to be given to their testimony are for the jury to decide. The verdict of a jury will not be disturbed unless it is so unsatisfactory as to leave a reasonable doubt of defendant's guilt. (*People v. Hairston*, 46 Ill.2d 348; *People v. Nelson, supra;* and *People v. Howard, supra*.) We find that the verdicts of the jury were supported by the evidence and were not so unsatisfactory as to cause a reasonable doubt of defendant's guilt.

The judgment is affirmed.

Judgment affirmed.

ENGLISH, P. J., and LORENZ, J., concur.