THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ARTHUR LEE JOHNSON, Defendant-Appellant.

(No. 12899; ▮▮▮▮▮▮▮▮▮▮)

Fourth District—October 10, 1975.

Richard J. Wilson and Daniel D. Yuhas, both of State Appellate Defender's Office, of Springfield, for appellant.

James R. Burgess, Jr., State's Attorney, of Urbana (G. Michael Prall and Kai A. Wallis, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. PRESIDING JUSTICE SIMKINS delivered the opinion of the court:

Defendant, Arthur Lee Johnson, appeals from his conviction of armed robbery and from a sentence imposed of 6 to 18 years' imprisonment. The sole issue raised here is whether the trial court erred in giving an accountability instruction.

Daniel Frye, a Champaign, Illinois, police officer, testified that shortly after 1 p.m. on December 14, 1972, he investigated an armed robbery at the Medical Arts Center in Champaign. He stated he received a radio broadcast giving the description of two individuals who were possibly involved in the robbery. About three blocks north of the scene of the robbery he observed a black male who matched one of the broadcast descriptions. He stated the individual tried to run from him, but he finally apprehended him. He identified the individual as the defendant. He testified a brown paper sack containing $126.90 was removed from the person of the defendant. He also stated that when arrested defendant had extremely long fingernails. On cross-examination Frye testified that at the time of his arrest defendant was wearing a brown leather coat, but he didn't remember whether or not defendant had any facial hair at that time.

Roger Lefler, an employee of the Medical Arts Center Pharmacy, testified that at approximately 1 p.m. on December 14, 1972, he observed two individuals enter the pharmacy. He described the said individuals as follows:

> "Well, they were both black males, approximately—both were approximately seventeen to twenty-three years of age. One was—the taller of the two was somewhere in the neighborhood of five-ten to six feet in height. The other was, uh, five-eight to five-ten in height. Both of them were fairly well built. They weren't obese. They were relatively slender. They both had dark coats on, and hats. The hats weren't dark but they were different. Both the coats were similar, about knee length.
>
> &ast; &ast; &ast;
>
> Well, the only hands that I saw were the hands of the shorter of the two. And I don't—well, the thing that was striking about them was that the fingernails on each, on every finger were quite long. They were about half-an-inch to three-quarters of an inch long.
>
> &ast; &ast; &ast;
>
> They looked quite similar really, with the exception of height
>
> &ast; &ast; &ast; "

He stated one of the individuals asked him where the restroom was lo-

cated, and he directed him to the second floor. He stated they then left in the general direction of the restroom. He testified they returned 5 to 10 minutes later and the shorter one asked if he had Pearl Drops toothpaste. He stated that after complaining about the price the shorter one asked to buy the toothpaste and handed him some money. As he started to give the shorter one change, he observed the taller individual pull a gun out of his pocket, shove it between his eyes, and state, "Put the money in the bag." He stated he reached under the counter, pulled out a brown bag, put the register money in the bag, and handed it to the shorter one. He estimated approximately $150 was taken. He further stated, although he was not certain, the defendant very closely resembled the taller of the two individuals. He stated defendant has the same skin tone, the same nice complexion and the same facial features as one of the individuals. He stated the taller individual was wearing a dark brown knee-length coat and hat similar to that seized from the defendant at the time of his arrest. He further stated the box of Pearl Drops toothpaste, the pharmacy bag, and the cash register receipt seized from defendant at the time of his arrest were the same items he handed to one of the robbers. He also stated the brown bag seized from defendant looked like the same bag into which he put the money. On cross-examination he stated:

"A. I just—mentioned that [referring to his identification of defendant as resembling the taller of the two] only on the basis of height because height is about the only way I could tell a difference between the two. Facially they were about the same. He looked, well, it's difficult to tell his height from here when he stood up because I was on the wrong level. But it could easily have been either one.

Q. Mr. Johnson could have been either one of the two men?

A. Facially, yes. As far as height goes, it depends on his height."

He further stated that when he saw defendant at the police station he had a small goatee on his chin.

Wayne Kobel, a Champaign police officer, testified he assisted in the arrest of defendant and he observed a brown paper bag fall from defendant's coat. He stated the brown bag contained $126.90, a sales receipt for a purchase from the Medical Arts Pharmacy and a box of Pearl Drops toothpaste. He stated defendant denied involvement in the robbery and told him three black males gave him the brown bag in the vicinity of the Medical Arts Center. He stated that at the time of his arrest defendant had a sparse growth of hair on his chin.

William J. Vanatta, a fingerprint examiner for the Federal Bureau of Investigation, testified a fingerprint found on the box of Pearl Drops

toothpaste corresponded to the right thumb fingerprint of defendant. He further stated there were no other fingerprints on the entire box.

Kenneth Frankenberry, a polygraph operator, testified he administered a polygraph test to defendant and that the stipulated results of the test indicated deception in defendant's answering of the following questions:

"A. 'On 12-14-72 about 1:00 P.M. did you enter the Medical Arts clinical pharmacy in Champaign?' His answer was, 'No.' The next question was, 'Did you steal money from the Medical Arts pharmacy at that point?' His answer was, 'No.' 'Did you help or plan to rob the Medical Arts pharmacy?' His answer was, 'No.' "Besides Kenny Shackelford do you know the full names of the people who robbed the pharmacy?' His answer was, 'No.' 'Did you find a brown paper bag containing the stolen money lying on the street?' His answer was, 'Yes.'"

Defendant testified in his own behalf that on the evening in question at approximately 1 p.m. he went to the Doctors' building alone to use the restroom. He asked a man where the restroom was, used it, and then went to the front of the building to wait for some boys he had previously met, including Kenny Shackelford. They told him to wait at a nearby building, he waited for 15 minutes, and he left to get a beer when they didn't come. He then described what happened as follows:

"I came across Springfield Street, I was headed north on Third. Well I saw one of the boys that was with Shackelford come across the street, just about maybe a block, block and a half, he ran across the street and a car almost hit him. He kept on running. Well when I got up in front of the Medical Arts building, well, on the other side of the street well I saw the bag down there with some money, you know, coins. And I looked at it, you know. I went to pick it up. And I picked the bag up and there was some money in the bag. And I just throwed it in there and put it down in my coat and walked on."

He saw two boys go by toward the hospital, but only one was running. Defendant then denied going into the Medical Arts building and stated that he did not hear the policeman yelling at him nor did he try to evade the police prior to his apprehension. That the statement he gave the police was false in many respects, and contrary to these prior statements he met three boys just outside the area of the Doctors' building but only knew the name of one of them. That his prior statement that he went to use the restroom in the Medical Arts building with a companion was the result of a misunderstanding.

Kenneth Griffith, a Champaign police officer, testified Roger Lefler told him that he felt sure that defendant was not one of the two robbers.

Bonnie Guffey testified that on the day and time in question she was on the second floor of the Medical Arts building visiting a doctor. She observed two young black gentlemen coming up the stairs to use the restroom and observed them as they went back downstairs. "One was about six foot. And the other about five-seven. And, uh, they had on knee length coats, hats." That defendant was not one of these two individuals because, "the gentlemen that I saw were both clean-cut. They didn't have no goatee or anything." She did note the clothing seized from defendant was similar to that worn by the two individuals she had observed.

During the conference on instructions the court overruled defendant's objection to the giving of People's Instruction No. 13, which reads in relevant part as follows:

"To sustain the charge of armed robbery, the State must prove the following propositions:

First: That a person took money from the person or presence of Rodger W. Lefler; and

Second: That the person took the money by a second person's use of force or threatening the imminent use of force; and

Third: That the second person was armed with a dangerous weapon; and

Fourth: That the defendant, Arthur Lee Johnson, either was one of those two persons, or before or during the commission of these acts and with the intent to promote or facilitate the commission of a crime did knowingly aid, abet, agree with or attempt to aid those persons in the planning or commission of these acts   *   *   *."

During closing arguments the State argued defendant could be guilty under an accountability theory. The jury then found defendant guilty of the offense charged.

■■ The defendant contends the trial court erred in giving the accountability instruction because there was insufficient evidence in the record to support such an instruction. We do not agree.

It is well established that there must be sufficient evidence to warrant the giving of an instruction on a particular issue. (*People v. Banks*, 26 Ill.2d 259, 186 N.E.2d 338.) Our reading of the entire record in the instant case clearly indicates that the giving of the accountability instruction was supported by the evidence adduced at the trial.

Under section 5—2(c) of the Criminal Code (Ill. Rev. Stat. 1973, ch. 38, par. 5—2) a person is legally accountable for the conduct of another when, "Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or

commission of the offense  *  *  *." As stated by the court in *People v. Littleton*, 113 Ill.App.2d 185, 189, 252 N.E.2d 77, 79, and as cited by this court in *People v. Tillman*, 130 Ill.App.2d 743, 749, 265 N.E.2d 904, 908:

> " 'A person may aid or abet without actively participating in the overt act or acts and evidence that the accused attaches himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common illegal purpose and will sustain his conviction as a principal for a crime committed by another in furtherance of the venture. (People v. Rybka, 16 Ill. 2d 394, 158 N.E.2d 17 [(1959)]; People v. Bracken, 68 Ill.App.2d 466, 216 N.E.2d 176 [(1st Dist. 1966)].)  *  *  *' "

■■ Defendant himself admitted he was near the scene of the robbery at the time in question. Defendant further admits he met some boys before he went to the Doctors' building and they told him to wait for them near the scene of the robbery while they presumably went into the Medical Arts building. Defendant also admits that he saw one of these boys running near the Medical Arts building, and that defendant shortly thereafter picked up the bag. The evidence further indicates defendant was apprehended shortly after the robbery with a brown bag containing the money, the toothpaste box, and the pharmacy receipt stolen during the robbery. Defendant's explanation of this recent and exclusive possession, to the effect that he found the brown bag on the street, is extremely incredible. The flight of defendant prior to his arrest and the finding of defendant's fingerprint on the toothpaste box also support the jury's verdict. The evidence here then shows defendant knowingly attached himself to a group bent on an illegal act, shows a specific act of aiding and abetting, and clearly supports an inference that defendant intended to engage in said criminal activity with the perpetrators of the crime by facilitating the commission of said offense. As the court in *People v. Hyde*, 97 Ill.App.2d 43, 53-54, 239 N.E.2d 466, 471, stated:

> "Even though there is no testimony that this defendant took the automobile from the owner in the first instance, he was tried with Lumpkins, *and the evidence of this defendant's possession was not satisfactorily explained. That evidence was sufficient for the jury to conclude that there was a common design* of attempting to deprive the owner of the use and benefit of his automobile permanently. The legal responsibility provided by the instruction extends to any act committed by such other person in furtherance of the common design. [Citations.] The evidence raises the issue of whether this defendant was a participant in any part of the crime and even slight evidence upon a given theory of the case will justify giving an instruction. [Citation.]" (Emphasis added.)

Since there was sufficient evidence here to support an accountability instruction, the trial court did not err in so instructing.

For the reasons stated above the judgment of the circuit court of Champaign County is hereby affirmed.

Judgment affirmed.

CRAVEN and TRAPP, JJ., concur.