THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GLENN ADDISON, Defendant-Appellant.

First District (5th Division)   No. 76-675

Opinion filed December 23, 1977.

T. Lee Boyd, Jr., and Isaiah S. Gant, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Joan S. Cherry, and Rimas F. Cernius, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

After a jury trial, defendant was convicted of murder and sentenced to a term of 30 to 60 years. He appeals and presents the following issues for review: (1) whether the trial court erred in denying his motion to quash the arrest and to suppress evidence; (2) whether the trial court erred in giving an accountability instruction; and (3) whether certain prosecutorial conduct denied him a fair trial.

During the afternoon of June 3, 1974, Dale Shippe, a laundry truck driver, and a co-employee, Melvin Boyd, stopped to make a pickup at 7723 South Yates, where Boyd entered the building. Shippe remained in the vehicle's driver's seat, completing some paper work. While working, he noticed two men—the taller of whom he identified as defendant—walk past the truck and stop about 30 feet ahead. Defendant then approached Shippe and asked that laundry be picked up at his home. Defendant said his name was Solomon and gave an address of 8508 South Commercial. Shippe recorded this information and confirmed its accuracy by reading it back to defendant. During their conversation, the shorter man also approached and he reached into the truck and pulled the keys from the ignition. Defendant then said to Shippe, "Sit still and be cool, you know what this is." After defendant closed the driver's door, both men went to the front of the truck where they confronted Boyd when he emerged from the building carrying a laundry bag. Defendant then pulled out a gun and ordered Boyd to be cool, but Boyd removed the laundry bag from his shoulder, placed it in front of himself, and attempted to push past the two men. As defendant inquired of the shorter fellow, "Should I shoot him," Boyd managed to run past them into the truck. He shut the passenger door behind him. Defendant then placed the palm of his hand against the top center of the passenger window, curled his fingers around the top edge, and pulled down the window, aimed the

gun at them, and said, "Now, sit still or I'll blow your head off." Boyd then opened the door and told them that neither he nor Shippe had the key to the safe in the truck. In response, defendant handed the gun to the shorter man and told him, "If either one of them moves, shoot them." When the shorter man suggested that they leave, defendant replied, "Let's get something anyhow." Defendant then proceeded to search Boyd, and when he attempted to unbutton his wallet pocket, Boyd pushed him. At this point the gun being held by the shorter man discharged, and Boyd fell mortally wounded. The two men then fled.

Defendant testified in his own behalf that on June 3, 1974, he was walking alone in the 7700 block of Yates, where he asked Shippe to arrange a laundry pickup at his home. Because he was living with Terry Solomon in an apartment under her name, he gave the name of Solomon to Shippe and her address—which was 8208 South Commercial. As he and Shippe spoke, a man whom he knew as Angelo Jones but who he had not previously seen in the area approached the truck holding a gun. When Angelo pulled the keys out of the ignition, defendant asked what was happening and was told that he knew what this is. Angelo motioned defendant to move to the passenger side of the truck, where he stood passively during the remainder of the incident, except that at one point he asked Angelo, "Why don't you leave these people alone?" Defendant further testified that Angelo at all times had possession of the gun, that it was Angelo who "tussled" with Boyd in the truck when the gun was fired, and that he ran upon hearing the shot. He did not call the police to report the incident, because he was in fear of Angelo. He had no explanation of how his palm print was left on the passenger's window of the laundry truck, and he testified that he had not pulled this window down.

Shortly after the shooting, police officer Raymond Relinski was called to the scene and, after receiving descriptions of the offenders, conducted a search of the area without success. At approximately 4 p.m., when he had completed his tour of duty, he received more thorough descriptions; i.e., that each was a black male in his early twenties—one being approximately 6 feet tall, 160 pounds, with a neatly kept afro, clean shaven and medium complexion, and the other being 5'8" or 5'10" tall, 145 pounds and processed hair. In addition, he was informed that a .45-caliber pistol was used by the pair and that one of them had given the name of Solomon and the address of "8508" South Commercial.

The next day, at approximately 1 p.m., Officer Relinski, while driving in the 8200 block of Exchange (one block away from the Solomon apartment) noticed defendant and another man crossing the street. Because he had arrested defendant on May 22, 1974, Relinski not only recognized him but also recalled that during this earlier arrest, defendant had used the name Solomon and the address 8208 South Commercial. It

was determined later that day that his name was Glenn Addison, of another address, and he was then booked under that name and address. In addition, Relinski noticed that defendant matched the description of the taller robbery and homicide suspect. In order to conduct a field investigation, he stopped the police vehicle and made a U-turn; whereupon, the two men began to run. Relinski and his partner chased them for a city block in their vehicle and then on foot. Using both the vehicle's radio and portable hand radio, Relinski made several calls for assistance. Shortly after he left the vehicle, Relinski observed that the man running with defendant had dropped a metal object, which Relinski recovered and found to be a .45-caliber automatic pistol. Relinski then resumed the chase and saw defendant run into the apartment building at 8208 South Commercial Avenue, with Officer Kostro and another police officer, who had joined the chase in response to a radio message for assistance, in close pursuit.

Officer Kostro testified that he ran up the stairs behind defendant and observed him run into apartment 3E and close the door. Numerous police officers had by this time converged on the building. Relinski was stationed outside to prevent escape from the apartment windows, while Kostro radioed for his supervisor. Meanwhile, Terry Solomon exited apartment 3E and, when asked about defendant, she said no one was in the apartment. After refusing to identify herself or to answer questions abut the man who had just run into her apartment, she was arrested and taken to the building's adjoining parking lot. Outside, she was told that the police would use force, if necessary, to enter the apartment and, according to Relinski, she volunteered the keys. Obtaining her keys, Kostro used them to unlock the door, but a chain guard prevented it from opening completely. Through this opening, Kostro observed defendant run from one room to another down a hallway. Kostro announced his office several times and asked that defendant come out, stating that the building was surrounded. Finally, Kostro kicked the door, breaking the chain lock, and he and other officers entered the apartment. Hearing the breaking of glass, Kostro entered a bedroom and observed a broken dresser mirror. Defendant was discovered secreted behind what appeared to be dresser drawers but which were, in reality, false fronts simulating drawers in place.

To the contrary, defendant testified that he had not been chased by the police on June 4; that the police had simply broken into the apartment he shared with Terry Solomon without warning and arrested him. It was Ms. Solomon's testimony that at approximately 1 p.m. on June 4, defendant entered the apartment, and she left three minutes later to purchase a newspaper. She saw no policemen on the way out, but on her return with the newspaper she was confronted by two officers in the parking lot adjoining the building and was asked to produce identification. She

refused to answer any questions, and they entered the building. They returned to the parking lot minutes later and again asked her to identify herself. She again refused and was arrested, and her keys were taken from her.

At the police station after his arrest, defendant was palm printed and placed in a lineup, from which Shippe identified him as the taller of the two men. Between 2 and 3 p.m., after *Miranda* warnings were read to him and he stated that he understood them, defendant told Officer Dioguardi that he knew nothing of the robbery and homicide. About 5 p.m., after *Miranda* warnings were again given to him, defendant was informed that his palm print matched the latent print taken from the passenger window of the laundry truck. At this point, defendant said that he had not been involved and was not present at the scene of the occurrence but that he knew Angelo Jones had committed the offenses. At about 10 p.m., after defendant was informed that he had been identified by an eyewitness, defendant told Dioguardi that he was with Angelo on June 2 when the latter obtained a .45-caliber automatic pistol, and that on June 3 he and Angelo were walking in the 7700 block of Yates when Angelo suggested they rob the laundry truck. During the course of the robbery, he said that Angelo was pointing the gun while he was trying to get Boyd's wallet, but when Boyd resisted and attempted to push Angelo, the gun discharged accidentally.

At trial, a fingerprint technician testified that in his opinion the palm print found on the passenger window of the laundry truck was that of defendant. A firearms identification technician testified that in his opinion the gun, which Relinski had earlier identified as that recovered during the chase, had fired the bullet which was involved in the shooting.

OPINION

■■ Defendant first contends that the trial court erred in denying his motion to quash the arrest and to suppress evidence obtained therefrom. We disagree.

An arrest without a warrant is reasonable if based on probable cause. (*People v. Macias* (1968), 39 Ill. 2d 208, 234 N.E.2d 783, *cert. denied* (1969), 393 U.S. 1066, 21 L. Ed. 2d 709, 89 S. Ct. 721.)

> " 'Whether or not probable cause for an arrest exists in a particular case depends upon the totality of the facts and circumstances known to the officers when the arrest was made. [Citations.] In deciding the question of probable cause in a particular case the courts deal with probabilities and are not disposed to be unduly technical. These probabilities are the factual and practical considerations of everyday life on which reasonable men, not legal technicians, act. [Citations.]' Also it is proper to recognize in

judging whether there was probable cause that '[p]olice officers often must act upon a quick appraisal of the data before them, and the reasonableness of their conduct must be judged on the basis of their responsibility to prevent crime and to catch criminals.' [Citation.]" (*People v. Robinson* (1976), 62 Ill. 2d 273, 276-77, 342 N.E.2d 356, 358.)

In appropriate circumstances, a police officer may approach a person for purposes of investigating a crime which has or is about to be committed. (*Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868; *People v. Lee* (1971), 48 Ill. 2d 272, 269 N.E.2d 488; Ill. Rev. Stat. 1975, ch. 38, par. 107—14.) Flight in the face of officers approaching under the *Terry* rule may supply the additional matter needed to constitute probable cause. (*People v. Beall* (1976), 42 Ill. App. 3d 452, 355 N.E.2d 756; *People v. Cribbs* (1972), 8 Ill. App. 3d 750, 291 N.E.2d 326; *People v. Staples* (1971), 1 Ill. App. 3d 922, 275 N.E.2d 259; *People v. Clay* (1971), 133 Ill. App. 2d 344, 273 N.E.2d 254.) The United States Supreme Court found flight may be properly considered as a matter of constitutional law, stating:

"[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea*, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest. [Citations.]" (*Sibron v. New York* (1968), 392 U.S. 40, 66-67, 20 L. Ed. 2d 917, 937, 88 S. Ct. 1889, 1904.)

Moreover, where a valid basis for arrest exists prior to entry and where entry is refused after the police have announced their office and purpose, all necessary and reasonable force may be used to enter any building or part thereof to accomplish the arrest. *Ker v. California* (1963), 374 U.S. 23, 10 L. Ed. 2d 726, 83 S. Ct. 1623; *People v. Johnson* (1970), 45 Ill. 2d 283, 259 N.E.2d 57, *cert. denied* (1972), 407 U.S. 914, 32 L. Ed. 2d 689, 92 S. Ct. 2445; *People v. Barbee* (1966), 35 Ill. 2d 407, 220 N.E.2d 401; *People v. Bell* (1976), 41 Ill. App. 3d 233, 355 N.E.2d 38; *People v. Carter* (1971), 132 Ill. App. 2d 572, 270 N.E.2d 603, *cert. denied* (1972), 406 U.S. 962, 32 L. Ed. 2d 350, 92 S. Ct. 2065; *People v. Scott* (1969), 110 Ill. App. 2d 368, 249 N.E.2d 220; Ill. Rev. Stat. 1975, ch. 38, par. 107—5(d).

■■ Here, Relinski testified that upon seeing defendant, he noticed that he fit the general description of the taller suspect involved in the occurrence in question and, at the same time, remembered that a few weeks before defendant had used the name of Solomon and, except for the discrepancy in a single digit, the same Commercial address. Although defendant's testimony indicated that Relinski could not have seen him and did not chase him on this date, the weight to be given their testimony

in this regard was a matter for the trial court, which was in a superior position to observe the demeanor of the witnesses. (*People v. Dees* (1977), 46 Ill. App. 3d 1010, 361 N.E.2d 1126.) As the trial court obviously believed the account of the police, we fail to see how it can be viably contended that Officer Relinski was without sufficient articulable facts to stop defendant for a field investigation. (*Terry.*) The record discloses that defendant took flight upon the approach of the law officers; that defendant appeared to Relinski to match the description of the taller suspect; and that defendant had previously used the Solomon name and a similar Commercial address in a prior arrest by Relinski. This information, we believe, supplied the officers with sufficient facts to form a reasonable belief that defendant had committed a crime. As probable cause existed prior to their entry and as they announced their office, we find the force used to enter the apartment reasonable under the circumstances. (*Ker; Johnson; Barbee.*) Accordingly, the trial court did not err in denying defendant's motion to quash and suppress.

■■■ Defendant next contends that the trial court erred in giving an accountability instruction. Again, we disagree.

A person is legally accountable for the conduct of another when, "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1975, ch. 38, par. 5—2(c).) Where the evidence raises the issue of whether the accused participated in any part of the crime, even slight evidence upon the theory of accountability will justify the giving of an instruction. (*People v. Johnson* (1975), 32 Ill. App. 3d 685, 336 N.E.2d 284.) "The fact that defendant might have been guilty of direct participation in the crime does not render the accountability instruction improper if there was also sufficient evidence that he aided another in the commission of the [offense]. [Citation.]" (*People v. Clifford* (1976), 38 Ill. App. 3d 915, 919, 349 N.E.2d 922, 925.) In the commission of an attempted robbery, it might reasonably be anticipated that resistance may be offered and a shooting of the victim may ensue. (*People v. Allen* (1974), 56 Ill. 2d 536, 309 N.E.2d 544, *cert. denied* (1974), 419 U.S. 865, 42 L. Ed. 2d 102, 95 S. Ct. 120.) "If the evidence establishes that defendant was attempting to commit a forcible felony and the victim's death was a result of that attempt, it is immaterial who fired the particular shot which killed the victim or whether the killing was intentional or accidental. [Citations.]" *People v. Danner* (1969), 105 Ill. App. 2d 126, 130, 245 N.E.2d 106, 108.

■■ In the instant case, defendant was indicted under three counts of murder—the last of which charged felony murder "in that he, while attempting to commit a forcible felony, to wit: armed robbery, shot and

killed Melvin C. Boyd * * *." The jury could have accepted Shippe's testimony that defendant actively participated in the armed robbery by holding Boyd and Shippe at gunpoint and that he handed the gun to his confederate with a statement that the victims be shot if they offered resistance. On the other hand, the jury could have believed the version of defendant, in which he portrayed the short man as the principal holding the gun with his activity limited to taking Boyd's money. Under the latter theory, the accountability instruction was supported by the evidence and was necessary to a finding that defendant was legally accountable for the attempt robbery as a prerequisite to a finding of felony murder. Consequently, we find no error in the giving of this instruction.

Lastly, defendant contends that prosecutorial misconduct denied him a fair trial. Specifically, he complains of the prosecutor phrasing a question to include a name once used by defendant (Frank Reed) when such was not in evidence, and asking defendant during his cross-examination whether two of the State's witnesses were lying. It is defendant's position that although defense questions were sustained, he was nonetheless prejudiced by them. We cannot agree.

■■ First, Terry Solomon, after stating that she knew defendant for about two years, was asked whether she knew him "when he went by the name of Frank Reed." An objection was sustained, and the jury was instructed to disregard the question. There was no further comment in the presence of the jury concerning the alias, and we believe that any conceivable prejudice was obviated by the court's instruction. (*People v. James* (1972), 4 Ill. App. 3d 1042, 282 N.E.2d 760.) *People v. Dukes* (1957), 12 Ill. 2d 334, 146 N.E.2d 14, cited by defendant, is not comparable. There, the prosecutor made "repeated" references to the defendant's alleged alias. He also made comments to the jury during his closing argument, without introducing any evidence in regard thereto, directly inferring that defendant's character was of a dubious nature, and the objections to these statements were overruled. In the instant case, there was no inference that the alias reflected on defendant's character, and the objections were sustained.

Second, asking the accused whether the State's witnesses had lied was improper, as "it is within the province of the jury to determine which witnesses, whose testimony conflicts, are telling the truth. [Citation.]" (*People v. Hicks* (1971), 133 Ill. App. 2d 424, 434, 273 N.E.2d 450, 458.) However, such questions standing alone are not necessarily prejudicial. (*People v. Meeks* (1973), 11 Ill. App. 3d 973, 297 N.E.2d 705, *cert. denied* (1974), 418 U.S. 905, 41 L. Ed. 2d 1153, 94 S. Ct. 3196.) "Although a prosecutor's remarks may be subject to criticism, unless they constitute a material factor in the conviction or are such that prejudice to the defendant is their probable result, the verdict will not be disturbed.

[Citation.]" (*People v. Weaver* (1972), 8 Ill. App. 3d 299, 307, 290 N.E.2d 691, 697. Accord, *People v. Jackson* (1974), 19 Ill. App. 3d 689, 312 N.E.2d 405, *cert. denied* (1975), 420 U.S. 935, 43 L. Ed. 2d 412, 95 S. Ct. 1144.) Moreover, the prosecutor's actions will not be viewed as prejudicial where the defense raises the matter. *People v. Hayes* (1975), 35 Ill. App. 3d 61, 340 N.E.2d 593.

■■■ In the instant case, while we do not condone the use of the term "lying," we see no resulting prejudice. On direct examination, defense counsel paraphrased certain damaging aspects of the testimony of Shippe and a police officer by asking defendant whether he heard their testimony. Each time defendant replied that he had, and he was then asked by his counsel whether that particular testimony was correct—to which he answered negatively. The prosecutor, in following defense counsel's lead, simply displayed less finesse by asking defendant whether he knew "any reason on God's earth why Dale Shippe would come in his courtroom and tell those horrendous lies about you?" On another occasion, after defendant admitted he had initially told the police he did not know anything about the crimes, the prosecutor asked why he had lied to the police at that time. Later, after referring to another officer's testimony, the prosecutor asked, "So, that officer is also lying, is that right?"

Objections to each of these questions was sustained. While this type of cross-examination is subject to criticism (*Meeks*), considering the totality of the circumstances, we do not view them as constituting a material factor in defendant's conviction. (See *Jackson*.) Neither do we see them as inflaming the passion or arousing the prejudice of the jury against defendant without throwing any light on the question for decision. See *Dukes*.

For the reasons stated, the judgment is affirmed.

Affirmed.

LORENZ and MEJDA, JJ., concur.