THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIAM
E. PEARSON, Defendant-Appellant.

First District (2nd Division)   No. 77-385

Opinion filed December 12, 1978.

James J. Doherty, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Joan S. Cherry, and Bryan B. Lavine, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE PERLIN delivered the opinion of the court:

Defendant was found guilty in a jury trial of murder, attempt murder and aggravated battery. The court entered judgment on the murder and attempt murder convictions, vacated the finding of guilt of aggravated battery and sentenced defendant to a term of 30 to 60 years. Defendant appeals, presenting the following issues for review: (1) whether the trial court erred in admitting into evidence identification testimony that was based on a photograph of a lineup held after the alleged unlawful arrest of defendant; (2) whether defendant was proved guilty of murder beyond a reasonable doubt; (3) whether the jury was erroneously instructed regarding the mental state required to convict of attempt murder; and (4) whether defendant was proved guilty of attempt murder beyond a reasonable doubt.

We affirm in part and reverse in part.

On January 4, 1975, at approximately 1 a.m. Sam Cobbins was shot and killed, and Terry Taylor was shot and seriously wounded at a party in the basement of the Scott residence in Chicago, Illinois. Defendant, William E. Pearson, was arrested and charged with the murder of Sam Cobbins and the attempt murder and aggravated battery of Terry Taylor. Prior to trial, defendant filed a motion to quash the arrest and to suppress identification by several witnesses on the basis that the identification from a lineup and from a photograph of the lineup was a result of unlawful arrest and of suggestive police conduct.

The following testimony was adduced at the hearing on the motion to suppress: Officer John Paladino testified that on January 4, 1975, at approximately 1:30 a.m. he and his partner received a radio call regarding a shooting at 99th and Aberdeen in Chicago. The call included a description of two suspects and a car. Officer Paladino proceeded to the police station and spoke with five or six witnesses. Officer Paladino

testified that all the witnesses gave descriptions of the suspects, and one, Tawny Kirkwood, told the officers that she knew one of the boys who had been arguing with Sam Cobbins, that his name was William (no last name given) and she knew where he lived. Tawny then showed Officer Paladino where William lived (a house on Halsted Street), and she returned to the police station. Officer Paladino and his partner then went back to the house and spoke to Mrs. Pearson, who stated that her son was at a party. The officers parked their unmarked car near the Pearson house, and approximately 45 minutes later two males approached the house. The officers requested identification and were told that the boys' names were William Pearson and Darnell Collins. The officers stated that they wanted to discuss a shooting that had occurred at 99th and Aberdeen. Defendant stated that he had been at a party at 48th and State. The officers took the two boys and Mrs. Pearson to the police station. At the station defendant and Collins were turned over to detectives and placed in a lineup.

Seven persons participated in the lineup and each was required to state his name, address and occupation and was required to turn around. It was established that defendant was the third person and Darnell Collins was the sixth person in the lineup.

Ann Scott testified that during a party in the basement of her house two people were shot. After the shooting, she went to the police station in a squad car with Darrell Scott, Tawny Kirkwood and Kyle Kirkwood. On the way, Tawny stated that one of the boys' names was William and she knew where he lived. They drove by a house on Halsted Street but did not stop. Mrs. Scott testified that at the station all the witnesses were placed in one room, and then they were taken one at a time to view a lineup. Mrs. Scott recognized the third and fourth persons in the lineup as being at the party.

Darrell Scott testified that he went to the police station at about 4 a.m. on January 4, 1975, and told police he did not know who did the shooting. He viewed a lineup, and police told him to pick out the one who was at the party. Scott recognized the third and fifth persons in the lineup.

Tawny Kirkwood testified that she was at the party at the Scott residence when the shooting occurred. Tawny spoke with police immediately after the shooting and told them one of the boys who was arguing with the decedent was William Pearson and she knew where he lived. She told police, however, that William did not do the shooting. Tawny then went to the police station in a squad car with several others, and on the way she showed police where William lived. At the station Tawny viewed a lineup and identified the third and sixth persons as being at the party. During the lineup police asked her if William Pearson did the shooting and she replied no. Tawny also heard police say that they had been "wanting Pearson for some time."

Kyle Kirkwood testified that he was at the Scott residence when the shooting occurred, and he went to the police station with his sister and several others. Kyle viewed a lineup during which police stated that "Pearson was the one" and that "Pearson had gone home and changed clothes." Kyle testified that before each person in the lineup stepped forward and stated his name, police asked him to point out William Pearson. Kyle did not identify anyone in the lineup.

Dwaine Clark testified that he was at the Scott residence when the shooting occurred. He first spoke to police at the house and told them he did not see the shooter. Dwaine gave police his name and went home. About 4 a.m. police came to his house and took him to the police station to view a lineup. During the lineup police asked if he recognized William and he replied in the negative. Dwaine recognized the sixth person in the lineup as being at the party.

Officer Alex McCrae testified that he and his partner took photographs of the lineup to the hospital so that Terry Taylor could view them. Terry Taylor did not recognize anyone. Officer McCrae then went to the Moore residence and saw Karen Moore and Sam Clark, and his partner showed them the photograph. They then found Larry Moore and he was shown the photograph.

Karen Moore testified that she was at the Scott residence when the shooting occurred, but she did not talk to police immediately after the shooting or give her name. Later in the morning, as she was walking with Sam Clark, police stopped them and asked if they would look at some pictures. One officer took Karen aside and showed her two photographs of a group of people. She recognized the third person as being at the party. After another officer showed the photographs to Sam Clark, they got in the police car and went to find Karen's brother, Larry Moore, who had also been at the party. They found Larry and then went to the police station where she again viewed the photographs and recognized the third and sixth persons as being at the party.

Larry Moore testified that he was at the party when the shooting occurred, but he did not speak to police until about noon on January 4, 1975. Police came to the Taylor home where he was visiting with Terry Taylor's mother and asked him to view some pictures. His sister and Sam Clark were in the police car. He viewed two photographs while standing outside the car, and he did not recognize anyone. Larry then got into the car and went to the police station. On the way he viewed the photographs again and recognized the third person as being at the party. Larry testified that police never mentioned the name "William Pearson," and that he did not have a conversation with his sister or Sam Clark before making the identification.

Defendant testified that police stopped him near his house and told

him he was suspected of murder. He was taken to the police station and placed in a lineup. Defendant was held for the night and then released at 8 a.m. on January 4, 1975. Defendant testified that police returned to his house at 4 p.m. the same day with a warrant for his arrest and took him to the police station.

After hearing all the evidence, the court found that there was no probable cause for defendant's arrest at 3 a.m. on January 4, 1975. The court suppressed the lineup identifications of all the witnesses except Tawny Kirkwood. The court found that Tawny had an independent basis for her identification. The court denied the motion to suppress the photographs of the lineup and the identifications made from the lineup photographs.

The following facts were adduced at trial: On the evening of January 3, 1975, Darrell Scott gave a party in the basement of his home at 9921 South Aberdeen. Darrell Scott and Myron Taylor stood at a door at the top of the basement stairs and collected 50 cents from each person entering the party. There was a light at the top of the stairs, six stairs to the basement and two lights in the basement, a light near a record player and a red light near the stairs. The basement was approximately 40 feet long and 20 feet wide.

At approximately 12 or 12:15 a.m. a group of seven or eight boys came to the Scott residence and began arguing with Darrell Scott. Larry Moore testified that he was at the door with Darrell when the boys came and that they were trying to get into the party without paying. Larry identified defendant as the person who was arguing with Darrell. Karen Moore testified that she was standing at the bottom of the stairs when the group came to the door, and she also identified defendant as the one who was "doing the talking." The boys finally paid $1, and Darrell allowed them to go into the basement.

Karen Moore (15 years old) testified that about 15 or 20 minutes after the group of boys came in, she was standing about 10 feet from the stairs talking to Sam Cobbins. Dwaine Clark came over and said some boy was bothering him. Sam Cobbins went with Dwaine, and a few seconds later Sam whistled and a group of Sam's friends went toward him. At this time Karen moved further away from the stairs. Karen testified that she then saw defendant backing up toward the stairs as if he had been pushed, and when he was on the second stair from the bottom he pulled a black gun from his jacket and shot Sam Cobbins. Karen testified that defendant fired three shots consecutively at Sam and then fired a fourth shot at Terry Taylor who was dancing. Defendant then left with a "short fat boy." Karen testified that she and her brother left the party right after the shooting, and she observed defendant get into a black and yellow Cadillac and drive away. Later that day Karen identified defendant and

the "short fat boy" in a photograph shown to her by police. Karen also made in-court identifications of defendant and Darnell Collins (the "short fat boy"). On cross-examination Karen stated that the person who shot Sam Cobbins was about six feet two inches, wore a brown leather jacket and a fur hat; that she did not remember what anyone else was wearing; that she did not talk to police immediately after the shooting; and that at the time of the shooting, her brother did not push her toward a refrigerator. Karen testified that there were about 60 people at the party, but only 25 to 30 were present at the time of the shooting, and that no one stood between her and defendant to block her view of the shooting.

Larry Moore (17 years old) testified that at approximately 12:45 a.m. he was standing near the record player which was across the basement from the stairs, and he saw defendant backing up the stairs. When defendant was on the second stair, he pulled out a black gun and shot Sam Cobbins and Terry Taylor. Larry testified that at the time of the shooting he pushed his sister toward a refrigerator and then got his feet tangled on a cord and knocked over the light near the record player. Larry then got his sister and left the Scott residence. As they were walking down the street Larry observed a yellow and black 1967 Cadillac. Larry testified that he did not give police his name or a description immediately after the shooting because he did not want to get involved, but he later changed his mind after learning that Sam was dead and Terry was injured. Later in the day Larry viewed a photograph and identified defendant as being at the party.

Tawny Kirkwood (16 years old) testified that on January 3, 1975, at approximately 8 p.m. defendant, whom she had known for a couple of years, came to her house with a few others whom she did not know. At the time, defendant was wearing a brown leather jacket and black fur hat. Defendant remained for about one hour, and before he left Tawny gave him a "plugger" or invitation to a party at the Scott residence. Tawny went to the party at about 10:30 p.m. Defendant was not there when she arrived, but he did come some time later, and Tawny asked him to dance, but he refused. She then went to dance with someone else, and while dancing she heard three or four shots. Tawny testified that her back was toward the stairs, and she did not see who did the shooting. When she heard the shots, she went behind a refrigerator and put her head down. When the shooting stopped, she saw Sam Cobbins and Terry Taylor lying near the bottom of the stairs. When police arrived, Tawny gave them her name and told them she knew one of the boys who had been arguing with Sam Cobbins and that his name was William. Tawny went to the police station and on the way Tawny showed police where William lived. At the station she viewed a lineup and identified defendant. She also identified Darnell Collins as being at her house on the evening of the shooting, but

Tawny stated that she did not know whether Darnell was at the party. Tawny testified that she did not smoke or drink at the party, and that there was sufficient light in the basement so one could see where he was going.

Samuel Clark (16 years old) testified that he was at the party at the Scott residence, and that while he was in the back part of the basement, he saw Sam Cobbins push another boy. He then heard Sam Cobbins whistle, and Clark went over to help. There were a few people standing around Cobbins, including Dwaine Clark, defendant and a "short fat boy." Clark identified the short fat boy in court as Darnell Collins. Clark testified that Cobbins was pushing Collins, and Clark then grabbed defendant and told him they did not want any trouble. Clark then pushed defendant toward the stairs. Clark looked toward Cobbins, and he heard four shots. At the time the shots were fired, another friend pushed Clark under the stairs. Clark testified that he was about one-half foot away from Sam Cobbins when the shooting started, and while looking in the direction of Cobbins he could also see the stairs. The only person on the stairs was defendant. After the shooting, Clark went to the police station with several others, and he heard Tawny state that one of the boys' names was William. On cross-examination Clark stated that at the station he told police he could not see the gun because it was too dark in the stairwell. Clark viewed a lineup and identified defendant and Darnell Collins. Clark testified that he recognized defendant and Collins before each person in the lineup was required to state his name, and that the police did not tell him whom to identify. Some time in the afternoon of the day of the shooting, Clark was shown a photograph, and he identified defendant as the shooter. Clark testified that he saw some people with beer cans at the party, and that Sam Cobbins was not drinking at the party but had some vodka to drink before the party.

Ann Scott testified that her son held a party in the basement of her house on January 3, 1975. Most of the evening Mrs. Scott was in the basement sitting near the record player and watching the people. Mrs. Scott observed defendant at the party for about 10 minutes and from a distance of three feet. Mrs. Scott was not in the basement at the time of the shooting, but she heard three shots from upstairs. After the shooting, Mrs. Scott went to the police station. Mrs. Scott testified on cross-examination that she viewed a lineup and identified defendant as being present at the party.

Officer Romas Arbataitis testified that at approximately 1:05 a.m. on January 4, 1975, he responded to a call at 99th and Aberdeen. He and his partner were the first to arrive, and he saw some people running from the house. Officer Arbataitis went to the basement and observed one boy

lying at the bottom of the stairs and a second boy about 10 feet away. Both boys had been shot. Officer Arbataitis observed 10 or 12 people in the basement; he spoke to a few and then transported three people, one of whom was Tawny Kirkwood, to the police station. On the way he drove past 8808 South Halsted. Officer Arbataitis testified that he did not smell alcohol on Tawny's breath but did smell alcohol on Sam Cobbins, and he saw 10 or 12 beer cans in the basement. He did not recover any weapons.

Officer John Paladino testified that on January 4, 1975, he spoke to Tawny Kirkwood at the police station and then went to 8808 South Halsted and spoke to Mrs. Pearson. He then saw defendant and Darnell Collins on Halsted Street, and he took them to the police station. At the time, defendant was wearing a brown leather jacket, light colored pants, a black hat and platform shoes. Officer Paladino did not recover any weapons.

Officer David Dioguardi testified that on January 4, 1975, he went to Little Company of Mary Hospital to interview Terry Taylor and to show him a photograph of a lineup depicting seven individuals. He then had conversations with Karen Moore, Sam Clark and Larry Moore and showed them each the lineup photograph. After taking statements from each of them at the police station, Officer Dioguardi went to defendant's home and placed defendant under arrest. Defendant was taken to the station and advised of his constitutional rights. Defendant told Officer Dioguardi that he had no knowledge of a shooting, and that he was at a party at 48th and State with Darnell Collins until 1:30 a.m.

It was stipulated that defendant was 18 years old at the time of trial. It was also stipulated that Officer Michael Rock transported Sam Cobbins from the Scott residence to Little Company of Mary Hospital, where Dr. D. Williams pronounced him dead at 1:10 a.m. Officer Rock then transported the body to Cook County Morgue. It was further stipulated that Dr. Yuksel Conacki, coroner pathologist for Cook County, performed an autopsy on the body of Sam Cobbins and observed two bullet wounds of entry character, one in the neck and one in the back of the head. Dr. Conacki concluded that the cause of death was a gunshot wound in the head and brain. Fluids were drawn from the body and given to Dr. Christopoulos, coroner's toxicologist, who performed various tests and concluded that Sam Cobbins was intoxicated at the time of death.

Terry Taylor testified that on January 3, 1975, while at a party at the Scott residence, he was shot. Just prior to being shot, Terry was dancing with his sister and was about six feet from the stairs. Terry testified that he did not see the person who shot him, that he did not know where the person was who did the shooting, and that he did not know whether

defendant was at the party. Terry did not have any weapons at the time he was shot. It was stipulated that Terry Taylor was shot with a deadly weapon and received great bodily harm.

Officer Fred Hill examined the lineup photograph in court and testified that he recognized a person in the photograph as someone he spoke with during the investigation of Sam Cobbins' homicide. The person told Officer Hill that his name was Darnell Collins. After speaking to Collins, he observed Collins get into a 1967 black and green Cadillac and drive away.

Based on the foregoing evidence, the jury found defendant guilty of the murder of Samuel Cobbins, attempt murder of Terry Taylor and aggravated battery of Terry Taylor. The court entered judgment on the findings of murder and attempt murder and sentenced defendant to a term of 30 to 60 years.

Defendant initially contends that the trial court erred in admitting into evidence the identification testimony of Karen Moore, Larry Moore and Samuel Clark because the identifications were made from a photograph of the lineup. Defendant argues that the photograph was a fruit of the illegal arrest and thus the identifications based on the photograph should have been suppressed.

■■ The exclusionary rule provides that evidence obtained as a direct result of an unlawful arrest cannot be used in a criminal proceeding. (*United States v. Calandra* (1974), 414 U.S. 338, 38 L. Ed. 2d 561, 94 S. Ct. 613.) As an extension to the rule, evidence indirectly discovered as a result of information gained from an unlawful arrest ("fruits") must also be suppressed. (*Wong Sun v. United States* (1963), 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441.) However, exceptions to the exclusionary rule have developed and these were summarized in *United States ex rel. Owens v. Twomey* (7th Cir. 1974), 508 F.2d 858, 865:

> "[T]here have evolved three tests from *Wong Sun*, any of which, when applicable, establishes that the controverted evidence is not fruit of the poisonous tree when: (1) the evidence was discovered by an independent source; (2) the evidence is sufficiently distant in causal connection from the illegal search and seizure so that the connection has become so attenuated as to dissipate the taint; or (3) the evidence inevitably would have been gained even without the unlawful search."[1]

■■ The State contends that the lineup photographs and subsequent identifications would have been obtained without defendant's unlawful arrest. The rule has developed that if the unlawful arrest was purely for

---

[1] *Owens* was cited and followed in *People v. Holdman* (1st Dist. 1977), 51 Ill. App. 3d 484, 366 N.E.2d 993, *rev'd on other grounds*, 73 Ill. 2d 213, 383 N.E.2d 155; and *People v. Hornal* (5th Dist. 1975), 29 Ill. App. 3d 308, 330 N.E.2d 225.

investigative purposes, solely to acquire data regarding defendant, the evidence should be suppressed. (*Davis v. Mississippi* (1969), 394 U.S. 721, 22 L. Ed. 2d 676, 89 S. Ct. 1394; *United States v. Edmons* (2d Cir. 1970), 432 F.2d 577; *People v. Pettis* (1st Dist. 1973), 12 Ill. App. 3d 123, 298 N.E.2d 372.) In *Edmons*, FBI agents were instructed to arrest anyone who might have been involved in an altercation with several FBI agents. Defendant was arrested along with several others for failure to have a selective service card, and while in custody defendant was photographed. Agents then identified defendant as being involved in the altercation, and he was charged with assault and interfering with a federal agent. The court held that the arrest was unlawful and the identification was the fruit of the illegal arrest. The court stated:

"When the police, not knowing the perpetrator's identity, make an arrest in deliberate violation of the Fourth Amendment for the very purpose of exhibiting a person before the victim and with a view toward having any resulting identification duplicated at trial, the fulfillment of this objective is [an exploitation of the primary illegality]. We are not obliged here to hold that when an arrest made in good faith turns out to have been illegal because of lack of probable cause, an identification resulting from the consequent custody must inevitably be excluded. But in a case like this, where flagrantly illegal arrests were made for the precise purpose of securing identifications that would not otherwise have been obtained, nothing less than barring any use of them can adequately serve the deterrent purpose of the exclusionary rule." (432 F.2d 577, 584.)

Similarly in *Davis* there was a round-up of potential suspects and only after defendant was in custody and fingerprinted was there a link between defendant and the crime.

The case at bar can be distinguished from *Davis* and *Edmons*. Here the police investigation had centered on defendant prior to the initial unlawful arrest. The record clearly shows that Tawny Kirkwood had given police defendant's name, address and description. Officer Paladino testified that other witnesses also gave descriptions at the police station immediately after the shooting. The police knew that defendant had been at the party and had been fighting with Sam Cobbins. Thus, there was a link between defendant and the crime prior to the initial arrest. We note that the trial court found that although there was not sufficient probable cause, the arrest was made in good faith. The police did not exploit the initial arrest, but rather used the photograph in the same manner as one would use a "mug shot." The court in *People v. Pettis* refused to suppress an identification based on a "mug shot" that was obtained after an unlawful arrest.

■ The court did not err in admitting the identification testimony based on the lineup photograph. The record does not show that the initial arrest of defendant was made solely to acquire data regarding defendant or that the conduct of the police officers was flagrant. The investigation had focused on defendant, and the identifications by Karen Moore, Larry Moore and Sam Clark would have inevitably been obtained.

Defendant next contends that the evidence was not sufficient to prove him guilty of murder beyond a reasonable doubt.

■ It is established that the determination of a jury will not be disturbed unless there are facts and circumstances which create a reasonable doubt as to defendant's guilt. (*People v. Harris* (1972), 53 Ill. 2d 83, 288 N.E.2d 873.) The sufficiency of eyewitness identification, the credibility of the witnesses, the weight to be given to their testimony and inferences to be drawn therefrom are matters within the province of the jury. (*Harris*, at 87; *People v. Rogers* (5th Dist. 1974), 23 Ill. App. 3d 115, 318 N.E.2d 715.) Although a conviction cannot stand if identification testimony is vague, doubtful and uncertain (*People v. Hughes* (1st Dist. 1974), 17 Ill. App. 3d 404, 308 N.E.2d 137), the testimony of a single witness is sufficient to establish guilt beyond a reasonable doubt provided such witness had ample opportunity to observe defendant and such witness is credible. *People v. Stringer* (1972), 52 Ill. 2d 564, 569, 289 N.E.2d 631.

The evidence was uncontradicted that defendant was at the party on the night of the shooting and had been arguing with decedent and his friends. The witnesses had adequate opportunity to observe defendant since defendant was at the party approximately 15 to 30 minutes prior to the shooting and there were two lights in the basement. Sam Clark testified that he pushed defendant toward the stairs and that defendant was the only person on the stairs at the time of the shooting. Karen Moore and Larry Moore testified that they saw defendant pull out a black gun and shoot Sam Cobbins and Terry Taylor while standing on the second stair. Although Tawny Kirkwood told police that defendant was not the "shooter," her testimony at trial was that her back was toward the stairs at the time of the shooting and she did not see who did the shooting.

■ Although there are minor discrepancies in the testimony of the various witnesses, there was sufficient evidence for the jury to conclude that defendant was guilty of murder beyond a reasonable doubt.

Defendant next contends that the jury was erroneously instructed regarding the mental state required to convict of attempt murder. The following instructions submitted by the State were given to the jury:

"A person commits the crime of murder who kills an individual if, in performing the acts which cause the death,

he intends to kill or do great bodily harm to that individual

or another; or he knows that such acts will cause death to that individual or another; or he knows that such acts create a strong probability of death or great bodily harm to that individual or another."

"To sustain the charge of murder, the State must prove the following propositions:

*First*: That the defendant performed the acts which caused the death of Sam H. Cobbins;

*Second*: That when the defendant did so, he intended to kill or do great bodily harm to Sam H. Cobbins; or

he knew that his act would cause death or great bodily harm to Sam H. Cobbins, or

he knew that his acts created a strong probability of death or great bodily harm to Sam H. Cobbins."

"A person commits the crime of attempt who, with intent to commit the crime of murder, does any act which constitutes a substantial step toward the commission of the crime of murder. The crime attempted need not have been committed."

"To sustain the charge of attempt, the State must prove the following propositions:

*First*: That the defendant performed an act which constituted a substantial step toward the commission of the crime of Murder of Terry Taylor; and

*Second*: That the defendant did so with intent to commit the crime of Murder."

Defendant contends that, since the crime of murder is defined to include "intent to do great bodily harm" or knowledge of a "strong probability of death or great bodily harm," the instructions permitted the jury to find defendant guilty of attempt murder without finding he had the specific intent to kill. We note that defendant failed to object to the instructions and preserve the issue for review. However, as provided for in Supreme Court Rule 451(c) (Ill. Rev. Stat. 1975, ch. 110A, par. 451(c)), we believe the interests of justice require our review, especially in light of the recent supreme court decision of *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28, on the issue.

In *Harris* defendant was charged with attempt murder, and the jury was instructed as to the elements of attempt and the definition of murder. The instructions given were substantially the same as those given in the case at bar. The court found that the instructions were improper because they permitted the jury to return a verdict of guilty upon evidence that the defendant intended only to cause great bodily harm. The court held that the instructions must be clear that to convict for attempt murder,

nothing less than a specific intent to kill is required. This court has recently followed *Harris* in *People v. Brock* (1st Dist. 1978), 64 Ill. App. 3d 64, 380 N.E.2d 1102.

■■ The case at bar differs from *Harris* in that here defendant was charged with two separate offenses, murder and attempt murder, against two victims. However, *Harris* is controlling because the possibility still exists that the jury returned a guilty verdict for attempt without finding that defendant had the specific intent to kill. Where charges of murder and attempt murder are joined, the possibility of confusion is substantial, and the court must be cautious in instructing the jury. An instruction should state that the definition of murder for purposes of attempt includes only "A person commits the crime of murder who kills an individual if, in performing the acts which cause the death, he intends to kill." As the court held in *Harris*, instructions which describe the commission of attempt in terms of intent to cause great bodily harm are erroneous. Thus, the jury in the case at bar was erroneously instructed regarding the mental state required to convict for attempt murder.

In view of the previous discussion regarding instructions, defendant's final contention that he was not proved guilty of attempt murder beyond a reasonable doubt need not be reached.

Based on the foregoing, we affirm defendant's conviction for murder. We reverse the conviction for attempt murder and, pursuant to Supreme Court Rule 615(b) (Ill. Rev. Stat. 1975, ch. 110A, par. 615(b)), we reinstate the aggravated battery conviction and remand the cause for resentencing.

Affirmed in part and reversed in part and remanded.

DOWNING and BROWN*, JJ., concur.

---

* Justice Brown participated in this case during his assignment to the Illinois Appellate Court, First District.